**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

MARLIN HOLDING COMPANY LLC )
and UNITEDHEALTH GROUP )
INCORPORATED )
)
Plaintiffs, )
)
v. )
)
GLEN S. FEINGOLD, individually and as )
Trustee of the Glen S. Feingold Irrevocable )
Trust – 2015; BARBARA S. FEINGOLD, )
individually and as Trustee of the Samantha M. )
Feingold Irrevocable Trust – 2015, Barbara S. )
Feingold Irrevocable Trust – 2015, Glen S. )    C.A. No. _____
Feingold Irrevocable Trust – 2015, and Eric I. )
Feingold Irrevocable Trust – 2015; ERIC I. )
FEINGOLD, individually and as Trustee of the )
Eric I. Feingold Irrevocable Trust – 2015; and )
SAMANTHA M. FEINGOLD, individually )
and as Trustee of the Samantha M. Feingold )
Irrevocable Trust – 2015 )
)
Defendants. )
)
)
)
)
)

## **COMPLAINT**

Plaintiffs Marlin Holding Company LLC ("Marlin") and UnitedHealth Group

Incorporated ("UHG"), by and through their undersigned counsel, allege for their Complaint

against Defendants Glen S. Feingold, individually and as Trustee of the Glen S. Feingold

Irrevocable Trust – 2015; Barbara S. Feingold, individually and as Trustee of the Samantha M.

Feingold Irrevocable Trust – 2015, Barbara S. Feingold Irrevocable Trust – 2015, Glen S.

Feingold Irrevocable Trust – 2015, and Eric I. Feingold Irrevocable Trust – 2015; Eric I.

Feingold, individually and as Trustee of the Eric I. Feingold Irrevocable Trust – 2015; and

Samantha M. Feingold, individually and as Trustee of the Samantha M. Feingold Irrevocable Trust, upon knowledge as to themselves and their own acts and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.     This Action arises out of flagrant and willful breaches by Defendants of representations, warranties and covenants in a September 4, 2020 Equity Interest Purchase Agreement (the "Healthplex EIPA," attached hereto as Exhibit 1)[1], by which UHG's subsidiary Marlin purchased Healthplex America, LLC and its subsidiaries ("Healthplex") from Defendants as trustees for certain trusts (collectively, the "Sellers").  Healthplex is a dental insurance and administration company that writes risk contracts through certain state-licensed subsidiaries. The Healthplex EIPA closed on December 31, 2020.

2.     In the Healthplex EIPA, the Sellers made numerous representations and warranties, and agreed to critical covenants.  Certain of the principal representations and covenants related to Healthplex's past and future operation in the ordinary course of its business, including refraining from entering into material new contracts or deviating from the underwriting practices it followed in its ordinary course of business.  The Sellers, and Defendants individually, also agreed to indemnify Plaintiffs for any breach of the Healthplex EIPA, as well as any inaccuracy, error or omission in the financial statements utilized to calculate the final purchase price and any adjustments thereto.

---

[1]     At the same time the Healthplex EIPA was executed, the parties also executed a related Equity Interest Purchase Agreement by which Marlin also purchased a separate business, MCNA Healthcare Holdings, LLC and its subsidiaries, from certain Defendants individually and as trustees for certain trusts (the "MCNA EIPA").  The MCNA EIPA closed on November 17, 2020.  The MCNA EIPA is not at issue here except to the extent that the indemnities in the two agreements overlap.

3.      At the express direction and instruction of Defendant Glen Feingold, the President of Healthplex America, LLC and the designated Sellers' Representative for all Sellers under the Healthplex EIPA, Healthplex entered into an entirely uneconomic dental benefit contract with the Suffolk County Municipal Employees Benefit Fund ("SCME Contract") prior to the Healthplex closing that Feingold knew deviated wildly from Healthplex's ordinary practices and was priced at a guaranteed premium that was guaranteed to produce losses for years to come. The entry into this contract by Healthplex breached the Healthplex EIPA in numerous respects, including, among other things, by (i) deviating from Healthplex's Ordinary Course of Business by overriding Healthplex's methodologies for estimating policy liabilities and establishing premiums, (ii) entering into a material contract following signing of the Healthplex EIPA without Marlin's prior written consent, and (iii) failing to make a "true, correct and complete copy" of the SCME Contract available to Marlin within two Business Days of entering into the SCME Contract.  Further, Defendants failed to account for the SCME Contract in the financial statements upon which the purchase price was calculated, causing Marlin to overpay for Healthplex by tens of millions of dollars.

4.      The Sellers separately represented that Healthplex had not incurred any historical data breaches or unauthorized disclosures of personal data, and that the Company had data protection policies and procedures that were commercially reasonable and in compliance with laws.  Both representations were false.  Healthplex incurred an undisclosed data breach in 2020, and its policies and procedures at closing were not in compliance with applicable regulations. Those deficient policies and procedures caused a second breach in 2021.

5.    These breaches of the Healthplex EIPA have caused Plaintiffs substantial additional losses and remediation expenses, all of which Defendants agreed to indemnify in the Healthplex EIPA.

6.    By this action, Plaintiffs seek to hold Defendants to the bargain struck in the Healthplex EIPA, and to recover tens of millions of dollars from Defendants for their breaches of the Healthplex EIPA, including entering into the SCME Contract in willful breach of the express terms of the Healthplex EIPA.

## THE PARTIES

7.    Plaintiff Marlin is a Delaware limited liability company and the Purchaser of Healthplex under the Healthplex EIPA.  Marlin's sole member is Specialty Benefits, LLC, which is a Delaware limited liability company and a direct, wholly-owned subsidiary of United Healthcare Services, Inc. ("UHS"), a Minnesota corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.  UHS is a direct, wholly-owned subsidiary of UHG.

8.    Plaintiff UHG is a Delaware corporation and has its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.  UHG is a party to certain provisions of the Healthplex EIPA as the Purchaser Guarantor.  UHG is also a Purchaser Indemnified Party under the Healthplex EIPA that Defendants agreed, in Section 8.02 of the Healthplex EIPA, to indemnify from and against the losses resulting from the conduct alleged herein.

9.    Defendant Glen S. Feingold is a party to the Healthplex EIPA individually and as a Seller in his capacity as Trustee of the Glen S. Feingold Irrevocable Trust – 2015, which was an owner of equity interests in Healthplex.  Glen Feingold is a citizen of Florida.

10.     Glen Feingold is the Sellers' Representative under the Healthplex EIPA.  He was the Managing Member and President of Healthplex America, LLC, and the Chairman of each of the Healthplex operating subsidiaries.

11.     Defendant Barbara S. Feingold is a party to the Healthplex EIPA in her individual capacity and as a Seller in her capacity as Trustee of the following trusts:  Samantha M. Feingold Irrevocable Trust – 2015, Barbara S. Feingold Irrevocable Trust – 2015, Glen S. Feingold Irrevocable Trust – 2015, and Eric I. Feingold Irrevocable Trust – 2015, each of which was an owner of equity interests in Healthplex.  She was a Director or Manager of all of the Healthplex operating subsidiaries.  Barbara Feingold is a citizen of Florida.

12.     Defendant Eric I. Feingold is a party to the Healthplex EIPA in his individual capacity and as a Seller in his capacity as Trustee of the Eric I. Feingold Irrevocable Trust – 2015, which was an owner of equity interests in Healthplex.  Eric Feingold is a citizen of Florida.

13.     Defendant Samantha M. Feingold is a party to the Healthplex EIPA in her individual capacity and as a Seller in her capacity as Trustee of the Samantha M. Feingold Irrevocable Trust – 2015, which was an owner of equity interests in Healthplex.  She was a Director or Manager of all of the Healthplex operating subsidiaries.  Samantha Feingold is a citizen of Florida.

14.     Defendants, through the above-referenced trusts, owned all of the equity interests in Healthplex, and individually comprise the Feingold Immediate Family Members pursuant to the Healthplex EIPA.[2]

---

[2]     Dr. Jeffrey P. Feingold also was a Feingold Immediate Family Member and a party to the Healthplex EIPA.  Dr. Feingold passed away in October 2021.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because no Plaintiff is a citizen of the same state as any Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     This Court has personal jurisdiction over the Defendants in this action because each Defendant in the Healthplex EIPA "consent[ed] . . . to the personal jurisdiction of . . . any federal court located in the State of Delaware" for "any claims, causes of action or Proceedings . . . that may be based upon, arise out of or relate to" the Healthplex EIPA.  (Healthplex EIPA §§ 9.08(b), 9.17.)

17.     Venue is proper because each Defendant agreed in Section 9.08(b) of the Healthplex EIPA to suit in this Court and waived any objection as to (a) venue in this Court or (b) the convenience of this forum.

18.     The Healthplex EIPA is governed by Delaware law.  (Healthplex EIPA § 9.08(a).)

## FACTUAL BACKGROUND

**I.     <u>While UHG and Healthplex Discuss a Potential Transaction, Feingold Pursues Loss-Making New Business</u>.**

19.     Beginning in May 2020, UHG began discussions with Healthplex about a potential acquisition of Healthplex (and MCNA).  Healthplex's President and chief negotiator, Glen Feingold, sought to enrich himself and his family by drumming up new business that would make Healthplex appear more healthy than was the case.

20.     In the course of negotiations with UHG, Glen Feingold directed his staff to pursue new business that would expand Healthplex's sales pipeline at all costs.  One such effort that ultimately bore fruit was securing a new, fully-insured dental benefit contract with SCME.  The SCME Contract was priced and constructed using economic terms that would show sales

pipeline growth to UHG to support the purchase price, but would actually yield guaranteed substantial annual losses using Healthplex's own pricing tool.

21.     On or about May 27, 2020, SCME issued a request for qualifications ("RFQ") to provide administration services only ("ASO") for SCME's then self-insured dental benefit plan. The RFQ did not request or invite any proposal for a fully-insured dental benefit contract.  The RFQ provided that "the contents of [any] proposal" made in response to the RFQ would "become contractual obligations if and when a contract is awarded."

22.     In an ASO contract, in exchange for a fee, a third-party provider such as Healthplex provides only claims handling and other administrative services to the client, but the benefit plan (and associated risks and claim liabilities) are fully funded by the organization itself. In contrast, in a fully-insured contract, the third-party provider both administers the plan and indemnifies the benefits program, in exchange for monthly premium payments.  Fully-insured contracts typically generate significantly more revenue than ASO contracts in the form of insurance premiums, but the insurer remains on the hook for all of the benefit liabilities to patient insureds.

23.     Despite the fact that SCME requested only an ASO quote, Feingold sought to backfill Healthplex's sales pipeline with multi-year, fully-insured contracts without regard to their costs.  With respect to the SCME RFQ, Feingold specifically instructed Healthplex staff to pursue the SCME business as a fully-insured contract rather than an ASO contract, and he personally demanded that Healthplex's underwriting team disregard its standard practices by manipulating its pricing tool to pitch SCME an insurance proposal guaranteed to lose money, with money-losing rates guaranteed for four years.

24.     In its Ordinary Course of Business, Healthplex used a complex set of calculations to determine premiums for insured business.  Had the Healthplex Business Development team developed a pricing proposal for SCME using its ordinary course procedures, Healthplex would have produced a proposed premium rate of $114.11 per insured per month, with no rate guarantee beyond the second year.

25.     But Feingold was fixated on offering SCME a premium rate it could not refuse. He directed Healthplex staff to manipulate its pricing tool in ways far removed from Healthplex's Ordinary Course of Business in order to generate a much lower premium rate.  At Feingold's direction, Healthplex staff manually adjusted the inputs to Healthplex's pricing tool for the SCME proposal in ways not done in the ordinary course of Healthplex's business, or at all in the previous decade or more.

26.     Merely manipulating inputs and adjusting assumptions, however, was insufficient. Instead, to reach the pricing level Feingold demanded, Healthplex staff imposed an additional 10% discount to the already contrived premium rate.  Combined with the other manipulations Healthplex staff made to the tool, this meant that, even if every one of the manually manipulated and unprecedented underwriting assumptions was met, Healthplex still was guaranteed to lose 10% on the new business.

27.     The rating tool also took into account the duration of any rate guarantee offered with the premium.  It did not allow users to set a premium rate guarantee beyond two years. When Healthplex included a two-year rate guarantee in the rating tool, the rating tool applied an upward adjustment to the premium to account for risk associated with the duration of the guarantee.  In pricing the SCME Contract, Healthplex used the maximum two-year guarantee.

28.     On June 9, 2020, Healthplex responded to SCME's RFQ.  Healthplex included in its response proposals for fully-insured benefit plans, including a plan with a fixed premium rate of $57.61 per insured per month, about half the premium that Healthplex's pricing tool would have suggested if Healthplex had followed its ordinary course business practices and provided a rate guarantee of no more than two years.

29.     Defendants did not stop there.  They instead caused Healthplex to guarantee that understated rate for three years, and to cap any increase in the rate in a fourth year by 5%.  This, too, was aberrational.

30.     According to Healthplex's own, ordinary course pricing tool, the SCME Contract would generate a material loss for Healthplex from its inception and throughout the term of the contract.

31.     Not surprisingly, SCME notified Healthplex on September 10, 2020, that Healthplex had accepted the Healthplex proposal for a fully-insured contract, which was confirmed in an award letter to Healthplex dated September 15, 2020.

32.     Healthplex inexplicably later agreed to lower the premium rate even further to $57.39 without any actuarial support, again outside of its Ordinary Business Practices.  Healthplex memorialized the final terms in a document dated November 1, 2020.  In violation of Section 2.01(p) of the Healthplex EIPA, the SCME Contract was never "made available to Purchaser" prior to Closing, neither upon acceptance, nor upon confirmation by SCME, nor even upon Healthplex's own written confirmation of the contract on November 1, 2020.

33.     In November 2020, SCME mailed letters to its members notifying them of the agreed-upon fully-insured "enhanced" dental benefits plan by Healthplex.  SCME informed its members that new dental insurance cards reflecting the SCME Contract would issue in

December 2020 and directed retirees who intended to opt into the new Healthplex plan to do so by November 30, 2020.

34.     By no later than December 2020, Healthplex began performing under the SCME Contract by, among other things, hiring additional staff to implement the contract, which took effect as of January 1, 2021, the very first day after Marlin owned Healthplex.

35.     In the period January through October of 2021, dental claim costs were alone nearly double the amount of total revenues collected under the SCME Contract. As these losses continued to mount, UHG had to make a significant capital infusion to Healthplex in order to meet the capital requirements under governing New York insurance statutes and regulations, in large part due to losses from the SCME Contract. On November 18, 2021, the New York State Department of Financial Services (NYSDFS) notified Healthplex that its subsidiary Healthplex Insurance Company—the subsidiary through which Healthplex wrote the SCME Contract—did not have sufficient surplus in order to continue to operate as an insurer.

36.     In December 2021 and in June 2022, UHG infused a total of $25.5 million into Healthplex to shore up its statutory capital reserves and surplus. UHG was forced to seek these capital infusions, in part, because of a $20.6 million Premium Deficiency Reserve (PDR) required to account primarily for future claim payments under the SCME Contract.

## II.     The Healthplex EIPA.

37.     On September 4, 2020, the parties entered into the Healthplex EIPA, pursuant to which Marlin agreed to acquire Healthplex for $312 million (the "Base Purchase Price") in cash, plus or minus an aggregate adjustment (the "Closing Adjustment"). (EIPA §§ 1.02, 1.03(a), (c).) The parties closed the Healthplex EIPA on December 31, 2020.

38.     The Closing Adjustment includes the positive or negative value of the "Statutory Capital Difference," which is a measure of the aggregate excess (or deficit) capital and surplus

held by Healthplex's subsidiaries immediately before Closing as defined in Section 9.17 of the

Healthplex EIPA.  The Healthplex EIPA includes a process for the parties to exchange proposed

Closing Adjustments and each component thereof, including the Statutory Capital Difference,

and to resolve any differences presented among the proposed amounts to arrive at a Final

Statement and a Final Closing Adjustment.  (Healthplex EIPA §§ 1.03(a), 1.06(a), 1.07(a)–(d).)

39.    The Statutory Capital Difference and, therefore, the Final Statement and Final

Closing Adjustment did not reflect the substantial adverse impacts of the SCME Contract on

Healthplex's accumulated surplus, which were not known to Marlin at the time the Final

Statement became binding on the parties.  As a result, the Final Statement and Final Closing

Adjustment were misstated by at least $11.5 million.

40.    As is customary in acquisitions of a non-public company such as Healthplex, the

Healthplex EIPA contains a host of critical representations, warranties and covenants to protect

Marlin from value-destructive conduct by the Sellers prior to Closing, such as the SCME

Contract.

41.    In Article II of the Healthplex EIPA, "the Sellers, jointly and severally"

represented to Marlin, among other things, that, except as set forth specifically in the Sellers

Disclosure Letter:

A.    "Since December 31, 2019 through the date of this Agreement (A) there has not been a Material Adverse Effect, (B) the business of the Sellers and the Transferred Entities has been conducted in the Ordinary Course of Business and (C) there has not been any action taken by any Seller or Transferred Entity that, if taken during the period from the date of this Agreement through the Closing Date without Purchaser's consent, would constitute a breach of Section 3.01." (Healthplex EIPA § 2.01(h) (emphasis added).)

B.    "[T]he Transferred Entities have conducted their respective businesses in material compliance with . . . applicable Privacy and Security Laws and Standards, . . . [and] [t]here have not been any data breaches or other incidents of any unauthorized access to, or unauthorized disclosure or use of, any Personal Data in any Transferred Entities' possession or control, and . . . [t]he Transferred Entities

have implemented commercially reasonable policies and procedures designed to guard against the theft of, unauthorized access to, or loss of, Personal Data in the possession or control of the Transferred Entities."  (Healthplex EIPA § 2.01(t)(i)–(iii) (emphasis added).)

42.    The Sellers Disclosure Letter reveals nothing about the SCME Contract, or any data privacy breach or non-compliance with Privacy and Security Laws and Standards.

43.    In Section 3.01 of the Healthplex EIPA, the Sellers also "covenant and agree that from and after the date of this Agreement and prior to the Closing, unless the Purchaser shall otherwise approve in advance in writing, . . . the Sellers will, and will cause the Transferred Entities to use their respective Commercially Reasonable Efforts to, (A) operate the respective businesses of the Transferred Entities in the Ordinary Course of Business and (B) preserve intact in all material respects the respective businesses of the Transferred Entities."  Healthplex's "Ordinary Course of Business" means only "the ordinary and usual course of normal day-to-day operations of the businesses of the Sellers and Transferred Entities, as conducted by the Sellers and the Transferred Entities prior to the date of this Agreement consistent with past practice."

44.    By way of example, Section 3.01 provides that "the Sellers will not permit any Transferred Entity to," among other things:

A.    "[M]ake any material change in (i) financial accounting policies or procedures, (ii) investment, hedging, reserving, underwriting or claims administration policies or procedures or (iii) methodologies for estimating and providing for medical costs and other Liabilities, in each case, except as required by changes in GAAP or SAP (or any authoritative interpretation by a Governmental Entity thereof) or by applicable Law."  (Healthplex EIPA § 3.01(k) (emphasis added).)

B.    "[E]nter into any Contract that would have been a Material Contract had it been entered into prior to the date of this Agreement" other than in the Ordinary Course of Business.[3]  (Healthplex EIPA § 3.01(m) (emphasis added).)

---

[3]    A "Material Contract" for this purpose includes any agreement, such as the SCME Contract, "pursuant to which the Transferred Entities generated aggregate revenue through billing of third parties, revenue guarantees, subsidy payments or other payments

C.      "[I]ncur any Indebtedness, except to the extent pursuant to a letter of credit or credit facility with a traditional lending provider not to exceed Two Million Dollars ($2,000,000) in the aggregate; provided, that, in each case, the Transferred Entities' obligations thereunder will be released in full at or prior to the Closing," which includes any "minimum loss requirement obligations" from insurance policies "not already considered" in Healthplex's financial statements. (Healthplex EIPA §§ 3.01(t), 9.17 (emphasis added).)

45.     The Sellers also agreed that a "true, correct and complete copy of each Material Contract and each Contract entered into after the date of this Agreement that would have been a Material Contract if entered into prior to the date of this Agreement . . . will be made available to Purchaser within the earlier of two (2) Business Days of the entry . . . or immediately prior to Closing."  (Healthplex EIPA § 2.01(p) (emphasis added).)

46.     Article VIII of the Healthplex EIPA includes broad indemnification rights granted by the Sellers and Feingold Immediate Family Members to Marlin, UHG and other Purchaser Indemnified Parties.  Specifically, in Section 8.02 of the Healthplex EIPA, "the Sellers and the Feingold Immediate Family Members agree to and shall jointly and severally indemnify, defend and hold harmless the Purchaser (including, for the avoidance of doubt, the Transferred Entities), its Affiliates, its Representatives and their respective successors and permitted assigns (collectively, the "Purchaser Indemnified Parties") from and against any and all Losses imposed on, incurred or suffered by any Purchaser Indemnified Party in connection with or arising out of,"[4] among other things:

---

in excess of Three Million Dollars ($3,000,000) during the twelve (12)-month period," or "creating Indebtedness."  (Healthplex EIPA § 2.01(p)(i), (v).)

[4]     "Losses" include all "Liabilities, losses, damages, Orders and costs and expenses (including reasonable fees and expenses of attorneys, auditors, consultants and other agents) whether direct, indirect, consequential or special in nature."  (Healthplex EIPA § 9.17.)

A.      "[A]ny breach, inaccuracy or failure to be true and correct of any representation or warranty . . . when made or deemed to be made under the terms hereof (unless specifically provided otherwise)" (Healthplex EIPA § 8.02(a) (emphasis added));

B.      "[A]ny breach or non-performance of any covenant or agreement contained in this Agreement to be performed by the Sellers or the Feingold Immediate Family Members" (Healthplex EIPA § 8.02(c) (emphasis added)); and

C.      Any "inaccuracy, error or omission in the Final Statement, the Final Closing Adjustment or the components thereof, including the amounts and payees with respect thereto, in each case to the extent not adjusted for in the Final Statement or identified, disputed or resolved for pursuant to Section 1.07." (Healthplex EIPA § 8.02(h) (emphasis added).)

47.     The indemnification provided to the Purchaser Indemnified Parties in Section 8.02(a) of each EIPA for breaches of representations and warranties applies to Losses collectively under Healthplex EIPA and the MCNA EIPA that exceed in the aggregate $7.5 million (the "Basket"), except that the Basket does not apply, and Sellers and Feingold Immediate Family Members are liable without limitation for actions, such as those engaged in here, in Willful Breach of representations and warranties in Healthplex EIPA. (Healthplex EIPA § 8.04(a), (c).)

48.     The Basket also does not apply to the Sellers' agreed-upon indemnities in Section 8.02(c) and Section 8.02(h). The Purchaser Indemnified Parties are entitled to indemnification from the Sellers and the Feingold Immediate Family Members for the full amount of Losses for breaches of covenants or any inaccuracy, error or omission in the Final Statement, Final Closing Adjustment, or the components thereof. (Healthplex EIPA § 8.04(c).)

49.     The parties agreed in Section 9.10 of the Healthplex EIPA "that irreparable damage would occur and that the Parties would not have any adequate remedy at Law in the event that any of the obligations, undertakings, covenants or agreements of the Parties were not performed in accordance with their specific terms or were otherwise breached," and in such event "monetary damages . . . would not be an adequate remedy therefor" such that the parties

"shall be entitled to . . . enforce specifically the terms and provisions of this Agreement by a decree of specific performance."

III.    **Defendants Breached the Healthplex EIPA by Entering Into and Failing to Disclose and Account Properly for the Mispriced SCME Contract.**

50.    Healthplex's response to the SCME RFQ, as well as its entry into the SCME Contract, materially breached the representations and warranties in the Healthplex EIPA. Among other things, Healthplex deviated materially from its Ordinary Course of Business by proposing to SCME terms that diverged substantially from the ordinary and usual course of normal day-to-day operations of Healthplex and were inconsistent with past practice.

51.    Healthplex's entry into the SCME Contract following signing of the Healthplex EIPA also breached Section 3.01 of the Healthplex EIPA in numerous material respects.  Among other things, (a) the SCME Contract was not done in the in the Ordinary Course of Business for Healthplex, (b) it was a Material Contract that Healthplex could not enter into without Marlin's consent, which was neither sought nor received, (c) the SCME Contract terms reflect a material deviation from Healthplex's reserving, underwriting or claims administration policies or procedures and cost estimation methodologies, and (d) it caused Healthplex to incur prohibited Indebtedness.

52.    The Sellers also failed to disclose the SCME Contract in accordance with Section 2.01(p) of the Healthplex EIPA, which required them to provide "[a] true, correct and complete copy of each Material Contract" entered into between signing and Closing within two Business Days after entry and prior to Closing.  Defendants never provided a copy of the SCME Contract, or described its terms prior to the Healthplex deal closing other than to acknowledge in an October 19, 2020 spreadsheet provided to Marlin that it had entered into a binding SCME Contract while misleadingly touting the SCME Contract's anticipated revenues without revealing

its known loss-making terms, which is the opposite of a "correct" and "complete" disclosure of the Material Contract.

53.     The financial statements and information provided to Marlin by the Sellers in the Closing Notice and Estimated Closing Adjustment (Healthplex EIPA § 1.03(a)) were false and misleading because they in all respects omitted reference to the SCME Contract and failed to account for the massive negative financial implications of that loss-making agreement.  Among other things, the Sellers' proffered Statutory Capital Difference and, therefore, the Final Statement and Final Closing Adjustment (Healthplex EIPA § 1.07(d)) all were misstated by tens of millions of dollars by failing to address the substantial adverse impacts of the SCME Contract on Healthplex's financial condition.

**IV.    The Sellers Breached Representations and Warranties in the Healthplex EIPA Concerning Healthplex's Cybersecurity Compliance.**

54.     After Closing, Plaintiffs became aware of a February 2020 cybersecurity breach at Healthplex, which resulted in the exposure and possible release of the personal data of persons employed by the Transferred Entities.  The Sellers failed to disclose this incident, in violation of Section 2.01(t) of the Healthplex EIPA.

55.     Before and upon Closing, the Sellers were in breach of the Healthplex EIPA because the Transferred Entities' technology infrastructure was in violation of Privacy and Security Laws and Standards, including the NYSDFS Cybersecurity Regulation (23 NYCRR Part 500) for, among other reasons, failing to use effective controls such as multi-factor authentication, in violation of the Healthplex EIPA.

56.     The Healthplex Sellers' failure to disclose the prior cyber incident and Healthplex's ongoing non-compliance with governing Privacy and Security Laws and Standards

led to a second incident in November 2021, which resulted in unauthorized access to personal

customer data of the Transferred Entities.

57.    As required by HIPPA, UHG sent a notice of the November 2021 data breach to

affected persons, and it has incurred substantial Losses remediating Sellers' breaches of the

Healthplex EIPA.

**V.    Defendants Agreed to Indemnify and Hold Plaintiffs Harmless From All Losses Relating to the Above Breaches and Inaccuracies.**

58.    Defendants agreed in Section 8.02 of the Healthplex EIPA to indemnify fully all

Losses incurred or suffered by the Purchaser Indemnified Parties "in connection with or arising

out of," among other things, (a) "any breach, inaccuracy or failure to be true and correct of any

representation or warranty" in the Healthplex EIPA, (b) "any breach or non-performance of any

covenant or agreement contained in this Agreement to be performed by the Sellers or the

Feingold Immediate Family Members," and (c) any "inaccuracy, error or omission in the Final

Statement, the Final Closing Adjustment or the components thereof, including the amounts and

payees with respect thereto."

59.    In accordance with the Healthplex EIPA, on December 30, 2021, Marlin advised

the Sellers in writing that it had become aware of the SCME Contract, and that the SCME

Contract—as well as Healthplex's agreement to the terms of that contract and the Sellers' failure

to disclose or account for that contract—breached representations, warranties and covenants in

the Healthplex EIPA, including but not limited to Sections 2.01(f)(vii), 2.01(h), 2.01(p), and

3.01(m).  Marlin further advised the Sellers that the Final Statement and Final Closing

Adjustment were inaccurate and failed to account for the SCME Contract and those failures had

not been resolved by the Final Closing Adjustment process, obligating the Sellers to indemnify

tens of millions of dollars in Losses relating to the errors or omissions in those amounts under Section 8.02(h).

60.     On January 28, 2022, the Sellers acknowledged that the SCME Contract had been agreed to prior to Closing, but otherwise disputed Marlin's assertion of any breach.  The Sellers also acknowledged their indemnity obligations under Section 8.02(h), but argued that those express obligations were unenforceable because Marlin supposedly should have raised the Sellers' breaches and other misconduct in the Final Closing Adjustment process.

61.     In accordance with the Healthplex EIPA, on June 29, 2022, Marlin advised the Sellers in writing of the Sellers' breaches of the Healthplex EIPA in connection with the Healthplex cyber incident and its deficient policies, procedures and compliance, and demanded indemnification.  By letter dated November 30, 2022, the Sellers disputed their non-compliance with the Healthplex EIPA, and refused to provide the agreed-upon indemnity.

**COUNT ONE**
**BREACH OF CONTRACT**

62.     Plaintiffs incorporate by reference all facts and allegations above as if fully set forth herein.

63.     The Healthplex EIPA is a valid and binding contract between the parties thereto.

64.     Plaintiffs have fully performed all of their obligations under the Healthplex EIPA.

65.     The Sellers agreed in the Healthplex EIPA to numerous representations, warranties and covenants to conduct and to have conducted Healthplex's business before and after signing the Healthplex EIPA in its Ordinary Course of Business and in compliance with relevant laws and rules, to disclose truthfully information about its business, and to refrain from taking various actions before Closing without Marlin's consent.

66.     As more fully described above, the Sellers repeatedly breached or allowed or caused Healthplex to breach the Healthplex EIPA repeatedly in respect of the SCME Contract, including:

A.      Failing to operate Healthplex in its Ordinary Course of Business prior to signing by proposing to SCME terms that diverged substantially from the ordinary and usual course of normal day-to-day operations of Healthplex and were inconsistent with past practice, in violation of Healthplex EIPA Section 2.01(h).

B.      Failing to operate Healthplex in its Ordinary Course of Business after the effective date of the Healthplex EIPA by agreeing to the SCME Contract in violation of Healthplex EIPA Section 3.01(A).

C.      Permitting Healthplex to make material changes in its methodologies for estimating and providing for medical costs and other Liabilities after the effective date of the Healthplex EIPA by entering into the SCME Contract and subsequently agreeing to lower the premium on the SCME Contract even further to $57.39, in violation of EIPA Section 3.01(k).

D.      Entering into a Material Contract in violation of Healthplex EIPA Section 3.01(m) by entering into the SCME Contract after the effective date of the Healthplex EIPA.

E.      Permitting Healthplex to incur Indebtedness after the effective date of the Healthplex EIPA by agreeing to the SCME Contract, in violation of Section 3.01(t).

F.      Failing to "make available to Purchaser" a "true, correct and complete copy" of the SCME Contract within two Business Days after entry and prior to Closing, in violation of Section 2.01(p) of the Healthplex EIPA.

G.      Providing financial statements and information to Marlin that were false, misleading or incomplete by omitting reference to and failing to account for the SCME Contract, including the inaccurate Closing Notice submitted in breach of Section 1.03(a) of the Healthplex EIPA.

67.     As more fully described above, the Sellers breached or allowed or caused Healthplex to breach the Healthplex EIPA in respect of Healthplex's cybersecurity and privacy policies, compliance and experience, including:

A.      Failing to conduct the business of the Transferred Entities in material compliance with applicable Privacy and Security Laws and Standards, and their respective public-facing privacy policies, in breach of Section 2.01(t)(i).

B.  Failing to disclose the existence of pre-signing data breaches or other incidents of any unauthorized access to, or unauthorized disclosure or use of, any Personal Data in any Transferred Entities' possession or control, in breach of Section 2.01(t)(ii).

C.  Failing to adopt, maintain and enforce commercially reasonable policies and procedures designed to guard against the theft of, unauthorized access to, or loss of, Personal Data in the possession or control of the Transferred Entities, in breach of Section 2.01(t)(iii).

68.  Defendants, as both Sellers and Feingold Immediate Family Members, agreed in Sections 8.02(a) and (c) of the Healthplex EIPA to jointly and severally indemnify, defend and hold harmless Marlin, UHG and all other Purchaser Indemnified Parties from and against any and all Losses imposed on, incurred or suffered by any Purchaser Indemnified Party in connection with or arising out of the above-referenced breaches or representations, warranties and covenants.

69.  Under the Healthplex EIPA, the Losses for which Defendants agreed to indemnify Plaintiffs includes any liability or obligation, as well as all "losses, damages, Orders and costs and expenses (including reasonable fees and expenses of attorneys, auditors, consultants and other agents) whether direct, indirect, consequential or special in nature; provided, however, that Losses shall not include punitive damages (except for punitive damages actually paid to a third-party in connection with Losses resulting from a breach under this Agreement) or any amounts or damages that are not a reasonably foreseeable consequence of such breach." (Healthplex EIPA § 9.17.)

70.  The Purchaser Indemnified Parties have incurred or suffered substantial Losses in connection with or arising out of the Defendants' breaches of representations, warranties and covenants in the Healthplex EIPA.

71.  Plaintiffs are entitled to an Order from this Court requiring Defendants to specifically perform their obligations to indemnify Plaintiffs for all Losses in connection with or

arising out of the breaches of the Healthplex EIPA, or to an award of damages in an amount equal to Plaintiffs' Losses to be determined at trial.

**COUNT TWO**
**<u>WILLFUL BREACH OF CONTRACT</u>**

72.     Plaintiffs incorporate by reference all facts and allegations above as if fully set forth herein.

73.     The Healthplex EIPA is a valid and binding contract between the parties thereto.

74.     Plaintiffs have fully performed all of their obligations under the Healthplex EIPA.

75.     The Sellers agreed in the Healthplex EIPA to numerous representations, warranties and covenants to conduct and to have conducted Healthplex's business before and after signing the Healthplex EIPA in its ordinary course of business and in compliance with relevant laws and rules, to disclose truthfully information about its business, and to refrain from taking various actions before Closing without Marlin's consent.

76.     Defendants breached Section 2.01(h) by proposing the SCME Contract on terms and conditions that one or more Defendants, including Glen Feingold, knew and intended to be outside the Ordinary Course of Business. Defendants again breached Section 3.01 of the Healthplex EIPA by entering into the SCME Contract on terms and conditions that one or more Defendants, including Glen Feingold, knew and intended to be outside the Ordinary Course of Business.

77.     Defendants also caused Healthplex to enter into the SCME Contract knowing that it was a Material Contract entered into without Marlin's prior written consent and without providing a copy to Marlin, that the SCME Contract reflected a material change in the methodologies for estimating and providing for medical costs and other Liabilities, and the

SCME Contract would cause Healthplex to incur Indebtedness, all in breach of express terms of Section 2.01 and Section 3.01 of the Healthplex EIPA.

78.     Defendants also knowingly breached Section 1.03 of the Healthplex EIPA by subsequently providing Marlin with financial statements that did not reflect a reserve or other recognition that the SCME Contract was known to be a loss-generating contract in an effort to obscure the terms of the deal.

79.     The breaches of the representations, warranties and covenants set forth were Willful Breaches because each was a consequence of an act or an omission undertaken or omitted by Defendants with the actual knowledge that the taking of such act or omission would result in such breach.

80.     Marlin is entitled to an award of damages in an amount to be determined at trial.

**COUNT THREE**
**INDEMNITY**

81.     Plaintiffs incorporate by reference all facts and allegations above as if fully set forth herein.

82.     The Healthplex EIPA is a valid and binding contract between the parties thereto.

83.     Defendants, as Sellers and as Feingold Immediate Family Members, agreed expressly and without condition in Section 8.02(h) of the Healthplex EIPA to indemnify jointly and severally the Purchaser Indemnified Parties from and against any and all Losses imposed on, incurred or suffered by any Purchaser Indemnified Party in connection with or arising out of an "inaccuracy, error or omission in the Final Statement, the Final Closing Adjustment or the components thereof, including the amounts and payees with respect thereto, in each case to the extent not adjusted for in the Final Statement or identified, disputed or resolved for pursuant to Section 1.07."

84.    There was an inaccuracy, error or omission in the Final Statement, the Final Closing Adjustment or the components thereof because the substantial adverse financial impacts of the SCME Contract were not accounted for in the Statutory Capital Difference, the Final Statement or the Final Closing Adjustment in accordance with Section 1.07.  Thus, the SCME Contract was not "adjusted for in the Final Statement or identified, disputed or resolved for pursuant to Section 1.07."

85.    Defendants must indemnify Plaintiffs for all Losses imposed on, incurred or suffered by the Purchaser Indemnified Parties in connection with or arising out of these inaccuracies, errors or omissions in the Final Statement, the Final Closing Adjustment or the components thereof in accordance with Section 8.02(h).

86.    Plaintiffs are entitled to an Order from this Court requiring Defendants to specifically perform their obligations to indemnify the Purchaser Indemnified Parties for all Losses in connection with or arising out of any inaccuracy, error or omission in the Final Statement, the Final Closing Adjustment or the components thereof, or to an award of damages in an amount equal to the Purchaser Indemnified Parties' Losses to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment on their Complaint and request that this Court:

A.    Order Defendants to specifically perform their obligations under the Healthplex EIPA, including by providing the indemnities for Losses agreed to in the Healthplex EIPA and thereafter to pay to Plaintiffs the amounts due thereon, including pre-judgment and post-judgment interest; and

B.     In the alternative, award damages to Plaintiffs equal to all recoverable Losses (including all costs, expenses and attorneys' fees) in an amount to be determined at trial; and

C.     Award Plaintiffs pre-judgment and post-judgment interest on any Losses or damages in accordance with law; and

D.     Declare, pursuant to 28 U.S.C. § 2201, (a) that Defendants have breached representations, warranties and covenants in the Healthplex EIPA, (b) that Defendants' breaches of the representations, warranties and covenants were Willful Breaches, (c) that there was one or more inaccuracies, errors or omissions in the Final Statement, the Final Closing Adjustment or the components thereof, and (d) that Defendants must indemnify Plaintiffs for all Losses imposed on, incurred or suffered by the Purchaser Indemnified Parties in connection with or arising out of (i) any breaches of the representations, warranties and covenants in the Healthplex EIPA by Defendants or Healthplex or (ii) any inaccuracies, errors or omissions in the Final Statement, the Final Closing Adjustment or the components thereof; and

E.     Grant Plaintiffs such other and further relief as this Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ R. Judson Scaggs, Jr.*

OF COUNSEL:

Brian T. Frawley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel:  (212) 558-4000

Jason O. Heflin
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Tel:  (202) 956-7500

May 17, 2023

_____
R. Judson Scaggs, Jr. (#2676)
Michael J. Flynn (#5333)
Grant E. Michl (#7088)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
Tel: (302) 658-9200
rscaggs@morrisnichols.com
mflynn@morrisnichols.com
gmichl@morrisnichols.com

*Attorneys for Plaintiffs*